## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD MATTHEWS,   :
          :
    **Plaintiff,**   :
          : **3:10-CV-01215**
**v.**         :
          : **(JUDGE MARIANI)**
RUNCO'S TAVERN & GRILL, INC, :
et al.,         :
          :
    **Defendants.**  :

FILED
SCRANTON

AUG 0 5 2013

## **MEMORANDUM OPINION**

PER _____
DEPUTY CLERK

### I. Introduction

Presently before the Court are two motions for summary judgment filed by Defendant

Thomas Logan (Doc. 81) and by Defendants Officers William Arthur, Brian Borowicz, and

Joseph Flesher (Doc. 77). Plaintiff filed this action following a fight at Runco's Tavern and

Grill, after which he alleges he was arrested, charged, detained, and prosecuted in violation

of the Fourth and Fourteenth Amendments to the United States Constitution. (*See* Pl.'s

Second Am. Complaint, Doc. 48, at ¶¶ 12-32.) For the reasons set forth below, the Court

will deny both Motions for Summary Judgment, because there are genuine issues of

material fact which must be resolved at trial.

## II. Statement of Undisputed Facts

On the night of February 15, 2009 a fight broke out at Runco's Bar & Grill in Olyphant, PA. (*See* Pl.'s Second Am. Complaint at ¶¶ 12-14; Def. Logan's Answer to Pl.'s Second Am. Complaint, Doc. 54, at ¶¶ 12-14.) It began between defendant Thomas Logan (an off-duty, non-uniformed police officer on disability leave) and non-party Brian Doughton, for reasons that remain unclear. (*See* Pl.'s Second Am. Complaint at ¶ 14; Def. Logan's Answer to Pl.'s Second Am. Complaint at ¶ 14.)

The fight between Doughton and Logan moved outside, at which point the plaintiff, Richard Matthews, became involved. The parties dispute whether Matthews involved himself in order to break up the fight or whether he joined as another aggressor. (*Compare* Pl.'s Second Am. Complaint at ¶ 15 *with* Def. Logan's Answer to Pl.'s Second Am. Complaint at ¶ 15.) In any event, Logan's wife, Noreen Logan, testified to trying to separate Matthews from her husband by reaching around Matthews from behind and poking him in the eye. (*See* Pl.'s Brief in Opp. to Mots. for Summ. J., Ex. J, Doc. 84, at 18:7-20:4 (Deposition testimony of Noreen Logan, Feb. 2, 2012) (hereinafter "Noreen Logan Dep."); *cf.* Pl.'s Second Am. Complaint at ¶¶ 16-17.) Matthews then bit Noreen's finger, which caused her to jump off of his back. (Noreen Logan Dep. 20:4; Pl.'s Second Am. Complaint at ¶ 17.) Noreen testified that "[t]hen somehow my husband was able to slither away," (Noreen Logan Dep. 20:6), though it is unclear how, specifically, the fight actually ended.

2

Thomas Logan then telephoned the police. (*Id.* at 20:11-12; Pl.'s Second Am. Complaint at ¶ 20.)  Soon, Officers William Arthur, Brian Borowicz, and Joseph Flesher arrived on the scene, all of whom are named as defendants in this action.  As discussed below, there are serious disputes of fact over what they did when they arrived on the scene.  Ultimately, however, the officers arrested Matthews, who alleges that he was detained for 36 hours and banned from home for over one week.  (Pl.'s Second Amended Complaint at ¶ 29.)  He was prosecuted for assault and disorderly conduct, but was found not guilty.  (*Id.* at ¶ 30.)  An additional aggravated assault count was dismissed through nolle prosequi.  (*Id.*)

Matthews then sued Logan, Arthur, Borowicz, and Flesher, among others, alleging a malicious prosecution and selective enforcement[1] in violation of his constitutional rights under § 1983, as well as a pendent state law claim for malicious prosecution.  (*See id.* at ¶ 1, 49-51.)  The essence of his complaint is that he was singled out for arrest and prosecution because of a "pre-existing relationship" between Logan and the other three police officers "due to their [common] profession."  (*Id.* at ¶ 32.)  He alleges that the defendants acted out of "personal animus" toward him, which caused them to disregard exculpatory evidence in his favor, offered at the time of the arrest, and to overlook Logan's own wrongdoing.  (*Id.* at ¶ 42; *see also id.* at ¶¶ 26-28.)  He also alleges that Thomas Logan testified falsely at Matthews's criminal trial.  (*Id.* at ¶ 31.)

---

[1] Matthews actually alleged "selective prosecution."  For the reasons that he stated a claim for selective enforcement, see *infra* note 3.

The defendants have moved for summary judgment.  They raise three essential arguments.  First, they argue that Logan was not in police uniform on the night of the incident and never identified himself as a police officer during that night, meaning that he cannot be a state actor under § 1983.  (*See* Brief of Def. Thomas Logan in Supp. of Def.'s Rev. Mot. for Summ. J., Doc. 82, at 3; Defs. Officers Arthur, Borowicz, and Flesher's Am. Second Mot. for Summ. J., Doc. 77, at ¶¶ 12-14.)  Second, they argue that the three arriving officers had little to no prior relationship with Logan.  They argue that Borowicz had never met him before that night; that Flesher grew up in the same town and went to the same school as Logan, but were years apart in age; and that Arthur knew that Logan was a police officer but only considered him an "acquaintance." (Defs. Officers Arthur, Borowicz, and Flesher's Am. Second Mot. for Summ. J. at ¶¶ 16-18.)  Finally, the defendants argue that there was probable cause to arrest Matthews, who showed signs of having been in a bar fight and who was identified as the person who bit Noreen Logan and "attacked" her husband.  (*Id.* at ¶¶ 8-10.)

## III. Statement of Disputed Facts

Aside from these undisputed facts, regarding the essential outline of the fight, there is serious dispute about nearly every other significant fact.

First, the parties dispute whether Matthews entered the fight in order to break it up or whether he entered as an aggressor.  (*Compare* Pl.'s Second Am. Complaint at ¶ 15 *with* Def. Thomas Logan's Answer to Pl.'s Second Am. Complaint at ¶ 15.)  Noreen Logan

4

testified that Matthews was punching Tom Logan, (*see* Noreen Logan Dep. 17:14-22), but Matthews denies this, (*see* Pl.'s Second Am. Complaint at ¶ 15.)  Conversely, whereas some witnesses testify that Tom Logan initiated the entire fight in the first place, (*see* Pl.'s Brief in Opp. to Mots. for Summ. J., Ex. B, at 97:7-9, 98:8-13 (Deposition testimony of Marjorie Runco) (hereinafter "Runco Dep."); *id.*, Ex. H at 43:1-9 (Deposition testimony of Robert Doughton) (hereinafter "Robert Doughton Dep.")), Logan insists that he was the victim, (*see* Def. Logan's Answer to Pl.'s Second Am. Complaint at ¶ 21; *see also* Pl.'s Second Am. Complaint, Ex. G, at 11:9-10 (Deposition testimony of Officer William Arthur) (hereinafter "Arthur Dep.") (calling Logan "the victim in this case")).

Second, there is a dispute as to what Thomas Logan told the police when he called them to the scene.  Marjorie Runco has stated that she witnessed Tom Logan call the police and "told them there was a riot at Runco's [and to] sends [sic] every car you have," even though such statement was untrue.  (Pl.'s Brief in Opp. to Mots. for Summ. J., Ex. A, at 1 (written statement of Marjorie Runco, May 4, 2009)).  The real situation obtaining when Logan called the police, according to Ms. Runco, was that the fight was already over and the only problem was "one gentleman [i.e., Logan] who is completely out of control." (Runco Dep. 65:12-13).  Logan, on the other hand, casts the phone call in a benign light,

saying only that "police were called to the bar in response to a 911 call" that he initiated. (Def. Logan's Brief in Supp. of Rev. Mot. for Summ. J., Doc. 82, at 3.)[2]

Third, while it is undisputed that Logan was not in uniform at the time of the fight, the parties dispute whether he nonetheless used his police status to order the arriving officers to make arrests. (*Compare* Arthur Dep. 42:4-6 (denying that Logan ever ordered Arthur to do anything) *and* Def. Logan's Answer to Pl.'s Second Am. Complaint at ¶ 21 ("At no time did defendant 'order' any arrests or 'threaten' anyone.") *with* Runco Dep. 97:19-21 ("They all seemed like they knew who he was. He didn't come out and say I'm Tommy Logan but—he was dictating to [the police officers] you need to get him, him."); *and* Pl.'s Brief in Opp. to Mots. for Summ. J., Ex. I, at 31:16-18 (Deposition testimony of Edward Doughton) (hereinafter "Edward Doughton Dep.") ("[Arthur and Borowicz] were doing anything Tommy Logan was telling them to do. I mean, Tommy told them, here, do this, do this. They were listening to him.")).

Fourth, there is the question of fact as to how well the arresting officers knew Logan. They disclaim a personal relationship with him. (*See* Defs.' Officers Arthur, Borowicz, and Flesher's Am. Second Mot. for Summ. J. at ¶ 16-18). However, there is significant ambiguity as to how close they actually were. At least Officer Arthur knew Logan to be a police officer, (*see id.* at ¶ 18), which makes it significant that, as Officer Flesher testified, Arthur was the one who told Flesher and Borowicz to arrest Matthews. (Pl.'s Brief in Opp.

---

[2] None of the parties have provided the Court with a complete copy of Thomas Logan's deposition. Accordingly, the Court has no way of knowing at this stage if Mr. Logan has discussed his call in greater detail outside his official filings.

to Mots. for Summ. J., Ex. E, at 21:4-14 (Deposition testimony of Joseph Flesher, Mar. 18, 2011) (hereinafter "Flesher Dep.")).  Officer Flesher also testified that Logan "was an acquaintance" and that "[o]ur families grew up together.  We grew up in the same town." (Flesher Dep. 30:15-16).  He added that he went to the same school as Logan, though they were not in the same classes due to differences in age, (*id*. at 30:24-31-5), and that he spent a "couple months" working at the same bar as Logan's wife, (*id*. at 31:7-32:4).  It is factually unclear at this stage whether these relationships were sufficiently close to motivate the officers to do Logan's bidding, if we accept that Logan did in fact order the officers to make arrests, as Richard Matthews alleges.

Fifth, there is the question of whether the officers conducted a proper investigation. Matthews alleges that the officers at the scene ignored information that would exculpate Matthews.  (Pl.'s Second Am. Complaint at ¶ 25.)  Marjorie Runco testified that Officer Arthur cut her off in the middle of her explanation of what went on during the fight—an explanation that would have been inculpated Logan.  (Runco Dep. 68:10-70:14).  The plaintiff also claims that he gave the officers a signed statement giving his side of the story, which the officers ignored and which is included at Exhibit D of the Plaintiff's Second Amended Complaint.  (Pl.'s Second Am. Complaint at ¶ 27).

Relatedly, as discussed above, there is a question of whether Logan ordered the officers to arrest certain people.  If that turns out to be true, then the officers cannot be said to have conducted a proper investigation.  As discussed, the officers deny these allegations.

(See Defs. Officers Arthur, Borowicz, and Flesher's Answer to Pl.'s Second Am. Complaint,

Doc. 49, at ¶ 21). To the contrary, they testify to having interviewed various witnesses,

though they found that the witnesses either had no valuable knowledge or did not want to

get involved. (See Flesher Dep. 19:7-10 (discussing fruitless attempts to get information

from witnesses); Pl.'s Brief in Opp. to Mots. for Summ. J., Ex. M, at 62:14-21 (Deposition

testimony of Officer Brian Borowicz) (hereinafter "Borowicz Dep.") (testifying that "[w]e

asked several people" for information); Arthur Dep. 52:3-18 (testifying to speaking with Tom

Logan, Noreen Logan, Richard Matthews, Edward Doughton, Brian Doughton, Marjorie

Runco, and "multiple other people")). Officer Arthur's version of his encounter with Marjorie

Runco also contradicts Ms. Runco's story. Arthur testified that Ms. Runco simply stated that

she did not know what happened, at which point he moved on to interviewing someone

else. (Arthur Dep. 22:17-23:18.)

Sixth, and related to the investigation, there is a question of whether probable cause

for an arrest existed. The officers argue that they had probable cause to arrest Matthews

based on Noreen Logan's identification of him as the person who bit her, and based on the

marks on Matthews's hands which were consistent with being in a fight. (Defs. Officers

Arthur, Borowicz, and Flesher's Am. Second Mot. for Summ. J. at ¶¶ 8-10, 27; see also

Arthur Dep. 41:18-42:3 (stating that the marks on Matthews's "hands were consistent with

being aggressive as opposed to trying to pull somebody off")). The three defendant officers

also submitted an Affidavit of Probable Cause in which they further based their finding of

8

probable cause on Noreen Logan's statements and the marks on Matthews's hands. (*See*
Pl.'s Brief in Opp. to Mots. for Summ. J., Ex. N, at 1). However, if they did not in fact
conduct a proper investigation, but simply did Logan's bidding as the plaintiff alleges, then it
would be very unlikely that probable cause existed for an arrest. "Probable cause exists
where the facts and circumstances within the arresting officer's knowledge are sufficient in
themselves to warrant a reasonable person to believe that an offense has been or is being
committed by the person to be arrested." *United States v. Cruz*, 910 F.2d 1072, 1076 (3d
Cir. 1990). If the arresting officers acted as the plaintiff alleges that they did, then such
actions could not give rise to probable cause, because a reasonable officer would
understand that in that situation he was just following personal  or associational loyalties,
instead of disinterestedly apprising himself of all relevant facts and circumstances.

Seventh, there is a question of whether Logan provided false testimony at
Matthews's criminal trial. This is not discussed in the motions for summary judgment or in
their briefs in support, statements of facts, briefs in opposition, or counter-statements of
facts. Matthews alleges in his Complaint that Logan testified falsely, *see* Pl.'s Second Am.
Complaint at ¶ 31, but all defendants deny this, *see* Defs. Officers Arthur, Borowicz, and
Flesher's Answer to Second Am. Complaint at ¶ 31; Def. Thomas Logan's Answer to
Second Am. Complaint at ¶ 31.

## IV.   Standard of Review on Motion for Summary Judgment

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, .

. . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of

showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party

must offer specific facts contradicting those averred by the movant to establish a genuine

issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Inferences

should be drawn in the light most favorable to the non-moving party, and where the non-

moving party's evidence contradicts the movant's, then the non-movant's must be taken as

true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992),

*cert. denied* 507 U.S. 912 (1993).

## V.   Analysis

### a.  Malicious Prosecution: Federal Law

As the Defendants Officers' Second Amended Motion for Summary Judgment

states, it is well established that "[t]o prove malicious prosecution under Section 1983, a

plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the

criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without

probable cause; (4) the defendants acted maliciously or for a purpose other than

bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty

consistent with the concept of seizure as a consequence of a legal proceeding." *Estate*

*of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003); *see also McKenna v. City of*

*Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009) (same); *Donohue v. Rineer*, 469 Fed.

App'x 91, 91-92 (3d Cir. 2012) (same). Here, there are no disputes as to the plaintiff's

compliance with requirements (1), (2), and (5). Whether to grant the motion for summary

judgment hinges on whether requirements (3) and (4) have been met. As discussed

below, the Court cannot find as a matter of law that the defendants had probable cause

to arrest Matthews or that they acted without malice or acted only for the purpose of

bringing Matthews to justice. Accordingly, the Court will deny summary judgment on the

federal malicious prosecution claim.

### i. *Probable Cause*

The Third Circuit has held that, in § 1983 actions, findings of probable cause for

an arrest are best resolved by the jury. *See Montgomery v. De Simone*, 159 F.3d 120,

124 (3d Cir. 1998) (citing *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978)). Only in

"the appropriate case," where "the evidence, viewed most favorably to Plaintiff,

reasonably would not support a contrary factual finding," should a district court find the

existence of probable cause at the summary judgment stage. *See Sherwood v. Mulvihill*,

113 F.3d 396, 401 (3d Cir. 1997); *see also Woodyard v. Cnty of Essex*, 2013 U.S. App.

LEXIS 4486, at *11-12 (3d Cir. 2013) (same).

As noted above, the Third Circuit has held that "[p]robable cause exists where the

facts and circumstances within the arresting officer's knowledge are sufficient in

themselves to warrant a reasonable person to believe that an offense has been . . .

committed by the person to be arrested." *Cruz*, 910 F.2d at 1076; *see also Jerrytone v.

Musto*, 167 Fed. App'x 295, 301 (3d Cir. 2006) (reaffirming *Cruz* language).

Viewing the evidence in the light most favorable to the plaintiff, as we must under

the requirements of Federal Rule of Civil Procedure 56, *see Big Apple BMW*, 974 F.2d at

1363, it is not clear that the arresting officers had probable cause.  The plaintiff claims

that he gave the officers a signed statement giving his side of the story, which the

officers ignored.  (Pl.'s Second Am. Complaint at ¶ 27.)  The plaintiff has submitted the

statement as Exhibit D to his Second Amended Complaint.  Even if the statement might

be seen as self-serving, it constitutes information that a reasonable officer would likely

want to verify before proceeding to an arrest.  Moreover, witness Marjorie Runco

expressed surprise that Thomas Logan—who she believed to be the initial aggressor—

was not arrested.  (Runco Dep. 97:7-9, 98:8-13.)  She also stated that she witnessed

Logan ordering the officers at the scene to arrest specific people, even though Logan

was not in uniform, was outside his police jurisdiction, and was an interested party in the

12

altercation, and therefore was in no position to justifiably give orders. (*Id.* at 97:19-21.) There is at least a triable issue of fact as to whether these claims, if true, are enough to make a reasonable police officer doubt the existence of probable cause.

Moreover, the three officers support their decision to arrest on (1) "the witnesses' identification and statements" and (2) "the physical evidence [i.e. swelling, redness, and cuts consistent with having been in a fight] on [Matthews's] hands." (Defs.' Officers Arthur, Borowicz, and Flesher's Mem. of Law in Supp. of their Second Mot. for Summ. J., Doc. 78, at 2.)

However, in the officers' motions before the Court, the only witness whose testimony they seem to credit is Noreen Logan, who is clearly an interested party. (*Id.*) In their depositions, they testify to interviewing other people, but make no mention of this in support of their finding of probable cause. (*See* Flesher Dep. 19:7-10 (discussing fruitless attempts to get information from witnesses); Borowicz Dep. 62:14-21 (testifying that "[w]e asked several people" for information); Arthur Dep. 52:3-18 (testifying to speaking with Tom Logan, Noreen Logan, Richard Matthews, Edward Doughton, Brian Doughton, Marjorie Runco, and "multiple other people")). If we credit Marjorie Runco's testimony—as we must at this stage, *see Big Apple BMW*, 974 F.2d at 1363—that Officer Arthur dismissed her account of events out of hand, (Runco Dep. 68:10-70:14), then that

is further evidence that the police officers did not conduct a reasonable investigation to establish probable cause.

As for the evidence of swelling, redness, and cuts on the plaintiff's hands, even if the Court were to accept Officer Arthur's statement that the marks on plaintiff's hands were consistent with aggression rather than "trying to pull someone off," (Arthur Dep. 41:18-42:3), the Court has no evidence to conclude that the marks are evidence of the *initiation* of aggression, rather than of legitimate defensive force. If Matthews were engaged in self-defense, then the police would have no more reason to selectively arrest him than if he were only involved in pulling apart the combatants. Therefore, whether the evidence enumerated by the defendants is enough to establish probable cause is a questionable issue of fact, best resolved by the jury.

Accordingly, the Court cannot find as a matter of law that the Officers had probable cause to arrest Matthews.

> ii. *Acting Maliciously or for a Purpose Other than Bringing the Plaintiff to Justice*

Because the Court cannot resolve the probable cause issue at the summary judgment stage, it likewise cannot resolve the question of whether malice is present. In this case, the two requirements are inextricably related. That is, if the arresting officers arrested the plaintiff without probable cause, despite contrary evidence, and at the

direction of Thomas Logan—as alleged by the plaintiff and backed up by Marjorie Runco and Robert Doughton's testimony—then there is at least reason to believe that the plaintiff's claims are meritorious and that he was targeted for arrest instead of Logan because Logan and the arresting officers shared a common profession.  There is at least a triable issue of fact regarding whether using police authority to protect those whom the arresting officers favor for personal and associational reasons, and to punish others who lack such connection to the arresting officers, should qualify as "acting maliciously or for a purpose other than bringing the defendant to justice."  Moreover, while any malicious intent on the part of the officers cannot negate probable cause if probable cause objectively exists, *see Scott v. United States*, 436 U.S. 128, 137-38 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."); *see also Wright v. City of Philadelphia*, 409 F.3d 595, 604 (3d Cir. 2005) (dismissing entire malicious prosecution claim in the absence of a showing that the officers lacked probable cause), the reverse is not necessarily true.  Arresting Matthews in the known absence of probable cause could be sufficient evidence of malice or of acting for a purpose other than bringing Matthews to justice.  *See Merkle v. Upper Dublin School*

*District*, 211 F.3d 782, 795 (3d Cir. 2000) (equating "act[ing] maliciously" with "pressing unfounded criminal charges" for retaliatory motives).

Accordingly, the Court cannot find as a matter of law that the defendants did not act maliciously or that they acted only with the purpose of bringing Matthews to justice.

    b.  Malicious Prosecution: State Law

Pennsylvania state law on malicious prosecution closely mirrors federal law. It requires proof that "the defendant instituted proceedings against the plaintiff (1) without probable cause, (2) with malice, and (3) that the proceedings must have terminated in favor of the plaintiff." *Kelley v. General Teamsters, Local Union 249*, 518 Pa. 517, 520 (Pa. 1988); *see also Chizmar v. Borough of Trafford*, 454 Fed. App'x 100, 105 (3d Cir. 2011) (following *Kelley*).

Though Pennsylvania courts prefer to reserve questions of probable cause for a judge, rather than a jury, *see Turano v. Hunt*, 158 Pa. Commw. 348, 352 (Pa. Commw. Ct. 1993) ("In cases of malicious prosecution, it is beyond cavil that the question of want of probable cause for the criminal prosecution that gave rise to the civil action is a question not for the jury but exclusively for the court. However, the question of the existence of probable cause may be submitted to the jury when facts material to the issue are in controversy.") (internal citations omitted), the various probable cause and malice standards do not differ significantly from federal law. *See Bruch v. Clark*, 352 Pa.

Super. 225, 228-29 (Pa. Super. Ct. 1986) (equating "malice" with acting "primarily for a purpose unrelated to bringing an offender to justice"); *La Frankie v. Miklich*, 152 Pa. Commw. 163, 168 (Pa. Commw. Ct. 1992) ("Probable cause is a reasonable ground of suspicion supported by circumstances sufficient to warrant that an ordinary prudent person in the same situation could believe that the party is guilty of the offense.").

Therefore, because the federal and state claims are so similar, the Court will deny summary judgment for the state malicious prosecution claim for the same reasons that it will deny it for the federal malicious prosecution claim. In this case, both claims contain sufficient disputes of material fact as to be best resolved by the jury.

   c.  Selective Enforcement[3]

A plaintiff alleging selective enforcement must show (1) that the law has been enforced unequally between similarly situated people and (2) that the authorities enforced "the law 'on the basis of an unjustifiable standard, such as race, or religion, or some other arbitrary factor,' or when they seek to enforce the law in order 'to prevent [the] exercise of a fundamental right.'" *Holder v. City of Allentown*, 987 F.2d 188, 197

---

[3] Though the parties call Matthews's claim "selective prosecution," it is actually a claim for "selective enforcement," because he solely alleged his claims against police officers, not prosecutors. "Selective enforcement" and "selective prosecution" are distinct claims. *See Dique v, Mulvey*, 2008 U.S. Dist. LEXIS 33683, at 26 (D.N.J. 2008). Neither party, however, has raised the mistake. Both treat "selective prosecution" as the applicable claim, and treating it as such does not change the outcome of any substantive analysis.

(3d Cir. 1993) (quoting *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989), *cert. denied*, 493 U.S. 995 (selective prosecution case))).

Most of the case law in this area involves protected groups, such as racial minorities, or people exercising enumerated constitutional rights, such as the freedom of speech.  However, if Matthews was indeed arrested because he was not a police officer, then it is at least arguable that Matthews falls into the category of "some other arbitrary factor."  *Cf. Rivera v. Lebanon School District*, 825 F. Supp. 2d 561, 565-66 (M.D. Pa. 2011) (holding that the "Equal Protection Clause protects against more than such invidious classifications as race, gender, and religion," that the Clause "has been interpreted to prevent any arbitrary classification of persons for unfavorable government treatment," and that therefore a § 1983 action brought by parents who were fined for their children's school truancy more than other similarly-situated parents could survive a motion to dismiss) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985) (selective prosecution case))).  At the outset, it certainly appears arbitrary to arrest someone just because he is not a police officer, in favor of someone who is.

There is no Third Circuit case law stating that only members of protected classes can assert selective enforcement or selective prosecution claims.  Given courts' expansive "other arbitrary classification" language, *see Wayte*, 470 U.S. at 608,

18

Matthews should not be precluded as a matter of law from raising his selective

enforcement claim before a jury.

Accordingly, the Court will deny summary judgment on the selective prosecution

claim.

> d.  State Action

In order to proceed with a § 1983 claim, a plaintiff must allege (1) "a violation of a

right secured by the Constitution" and (2) that the deprivation of that right "was

committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48

(1988).  To act under color of state law means to use authority derived from the state to

cause the violation of constitutional rights. *Harvey v. Plains Twp. Police Dep't*, 421 F.3d

185, 189 (3d Cir. 2005); *see also Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982)

("Our cases have . . . insisted that the conduct allegedly causing the deprivation of a

federal right be fairly attributable to the State.").  In the present case, it is clear that

Officers Arthur, Borowicz, and Flesher were acting under color of state law, so the above

analysis clearly applies to them.  However, the plaintiff's claims could be dismissed as

against Logan if Logan can show that there is no triable issue of fact that he was acting

under color of state law during the events in question.  Because, as discussed below,

Logan cannot meet that burden, his motions for summary judgment must be denied as

well.

19

Logan insists that he was not acting under color of state law during and after the fight at Runco's Tavern because he did not use state authority to cause the plaintiff's harm. Rather, he argues that he merely acted as a private victim of assault, who would be exempt from the reach of § 1983. (*See* Def. Logan's Brief in Supp. of Rev. Mot. for Summ. J. at 13.)

It is true that "acts of officers in their personal pursuits are plainly excluded" from the "color of state law" rule. *Screws v. United States*, 325 U.S. 91, 111 (1945); *see also Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3d Cir. 1994) ("[A] police officer's purely private acts which are not furthered by any actual or purported state authority are not acts under color of state law."). Thus, in *Barna*, the Third Circuit found that two police officers, who, while off duty and outside of their jurisdiction, beat up the plaintiff for supposedly hitting the sister of one officer, were not acting under color of state law. *Barna*, 42 F.3d at 817. The Third Circuit noted that the officers were not called to the plaintiff's home on police business, they did not attempt to arrest the plaintiff after beating him up, and they did not meet the relevant New Jersey requirements for acting outside their jurisdiction. *Id.* at 817-18. The only evidence for state action was that one of the officers responded to the plaintiff's statement that he was outside his jurisdiction by saying "I'll show you jurisdiction" and then proceeded to beat the plaintiff with a police-issued nightstick. *Id.* at 818.

Though the present case is similarly ambiguous, it differs from *Barna* in several respects. For these reasons, the Court finds summary judgment on the state action issue inappropriate.

First, there is Marjorie Runco's testimony that, even if Logan did not identify himself as a police officer, the officers who arrived on the scene recognized him as such and deferred to him. (Runco Dep. 97:19-21 ("They all seemed like they knew who he was. He didn't come out and say I'm Tommy Logan but—he was dictating to them you need to get him, him."); *see also id.* at 98:8-13 (describing shock that none of the officers even investigated Logan and that they only concerned themselves with Brian Doughton)). There is at least a question of fact regarding whether Logan could have exercised similar authority over uniformed officers if he were only a private assault victim, with no professional connection to the arresting officers.

Second, and relatedly, even though the officers disclaimed any personal relationship with Logan, they admit that at least Officer Arthur—who ordered Matthews's arrest—knew him to be a police officer. (*See* Defs.' Officers Arthur, Borowicz, and Flesher's Am. Second Mot. for Summ. J. at ¶ 18; Flesher Dep. 21:4-14). Likewise, Officer Flesher might also have a sufficiently close relationship to Logan to be on notice that Logan was a police officer. Flesher testifies that Logan "was an acquaintance" and that "[o]ur families grew up together. We grew up in the same town." (Flesher Dep.

30:15-16).  He adds that he went to the same school as Logan, though they were not in

the same classes due to differences in age, (id. at 30:24-31-5), and that he spent a

"couple months" working at the same bar as Logan's wife, (id. at 31:7-32:4).

    These relationships, even if attenuated, may be significant.  They raise a question

of fact as to whether the officers knew that Logan was a police officer, and whether they

accordingly deferred to him.  The Third Circuit in Barna stated that "off-duty police

officers who purport to exercise official authority will generally be found to have acted

under color of state law."  Barna, 42 F.3d at 816.  The Barna court added that,

"[m]anifestations of such pretended authority may include flashing a badge, identifying

oneself as a police officer, placing an individual under arrest, or intervening in a dispute

involving others pursuant to a duty imposed by police department regulations."  Id.

(emphasis added).  Though this case does not fall neatly into one of the enumerated

categories, it is clear from the language used that the Barna court did not intend its list to

be exhaustive.  Moreover, the Barna court's list contains examples of how a police officer

would communicate his officer status to others.  But if the evidence in the present case

indicates that the relevant arresting officers already understood that Logan was a police

officer, then it does not matter whether he orally, or by conduct, communicated his status

as such.

This analysis applies even though Logan was acting outside his jurisdiction. Regardless of the official jurisdictional basis for doing so, he could still effectively use the power that comes with his state-granted privileges to deprive Matthews of his constitutional rights.  *Cf. Griffin v. Maryland*, 387 U.S. 130, 135 (1965) (holding that a deputy sheriff, by identifying himself as such and purporting to act under his state authority, acted under color of state law even though he was actually working as the private agent of a privately-owned amusement park); *Johnson v. Hackett*, 284 F. Supp. 933, 937 (E.D. Pa. 1968) ("It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law.").

For the above reasons, the Court finds numerous questions of fact on whether Logan acted under color of state law on the night of the fight.  The only other time during which Logan's exercise of state authority is relevant is the time of Matthews's criminal trial.  The parties have provided very little discussion as to how Logan purported to exercise state authority to provide false testimony at Matthews's criminal trial. Nonetheless, because at the summary judgment stage the court must resolve this factual disagreement in favor of Matthews, the non-moving party, it will decline to grant summary judgment on the issue of Logan's conduct during the criminal trial as well.

Accordingly, the Court will deny summary judgment on the state action issue.

23

## VI.   Conclusion

For the foregoing reasons, the Court will deny both Motions for Summary Judgment

(Doc. 77; Doc. 81).  A separate Order follows.

Robert D. Mariani
United States District Judge